# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

BID PROTEST
No. 19-165C
Filed Under Seal:  June 27, 2019
Reissued For Publication:  July 10, 2019[*]

|  |  |  |
|---|---|---|
| PTC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Post-Award Bid Protest; Judgment Upon |
| v. | ) | The Administrative Record; RCFC 52.1; |
| | ) | Injunctive Relief; RCFC 65; Standing; |
| THE UNITED STATES, | ) | Subject-Matter Jurisdiction; Motion To |
| | ) | Dismiss; RCFC 12(b)(1). |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SIEMENS GOVERNMENT | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*Andrew E. Shipley*, Counsel of Record, *Philip E. Beshara*, Of Counsel, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for plaintiff.

*Mollie L. Finnan*, Trial Counsel, *Patricia M. McCarthy*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Joseph H. Hunt*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *Heather M. Mandelkehr*, Of Counsel, United States Air Force, for defendant.

*Jeffery M. Chiow*, Counsel of Record, *Robert S. Metzger*, Of Counsel, *Dennis J. Callahan*, Of Counsel, *Deborah N. Rodin*, Of Counsel, Rogers Joseph O'Donnell, Washington, DC, for defendant-intervenor.

---

[*] This Memorandum Opinion and Order was originally filed under seal on June 27, 2019 (docket entry no. 60).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted from the Memorandum Opinion and Order.  The parties filed a joint status report on July 9, 2019 (docket entry no. 62) proposing certain agreed-upon redactions and stating their respective views on certain other redactions.  And so, the Court is reissuing its Memorandum Opinion and Order, dated June 27, 2019, with the adopted redactions indicated by three consecutive asterisks within brackets ([***]).

## **MEMORANDUM OPINION AND ORDER**

GRIGGSBY, Judge

## I.    **INTRODUCTION**

Plaintiff, PTC, Inc. ("PTC"), brought this post-award bid protest matter challenging the decision of the United States Air Force ("Air Force") to award a sole-source contract for standardizing the Air Force's existing inventory of product lifecycle management software licenses, and continuing maintenance and related support, to Siemens Government Technologies, Inc. ("Siemens").

The government and Siemens have moved to dismiss this matter for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  *See generally* Def. Mot.; Def.-Int. Mot.  In addition, the parties have filed cross-motions for judgment upon the administrative record, pursuant to RCFC 52.1.  *See generally* Pl. Mot.; Def. Mot.; Def.-Int. Mot.

The government has also moved to strike the Declaration of [***] and a CIMdata report attached to PTC's motion for judgment upon the administrative record.  *See generally* Def. Mot. to Strike; Pl. Mot.  PTC has also moved to strike the Declaration of Andrew P. McMullen attached to the government's cross-motion for judgment upon the administrative record.  *See generally* Pl. Mot. to Strike; Def. Mot.

In addition, PTC has moved for a temporary restraining order and for a preliminary injunction, pursuant to RCFC 65.  *See generally* Pl. Mot. for TRO/PI.  Lastly, PTC has filed an unopposed motion to amend its motion for judgment upon the administrative record and reply brief to correct certain citations.  *See generally* Pl. Mot. to Am. Br.

For the reasons discussed below, the Court:  (1) **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to strike; (2) **DENIES** PTC's motion to strike; (3) **GRANTS** the government's motion to dismiss this matter for lack of subject-matter jurisdiction; (4) **DENIES** as moot Siemens' motion to dismiss this matter for lack of subject-matter jurisdiction and the parties' cross-motions for judgment upon the administrative record; (5) **DENIES** PTC's motions for a temporary restraining order and for a preliminary injunction; (6) **GRANTS** PTC's

unopposed motion to amend its motion for judgment upon the administrative record and reply brief; and (7) **DISMISSES** the complaint.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.   Factual Background

#### 1.   The Product Lifecycle Management Program

The Air Force's Product Lifecycle Management ("PLM") program is the agency's strategic business initiative to standardize its management of product data using modern PLM software.  AR § 1 at 328–32.  PLM software enables both engineering and logistics communities to manage the entire lifecycle of a product from its conception through design, manufacture, service, and disposal.  *Id.*  PLM also enables users to weigh the cost, performance, and risk of original products against alternatives.  *See* Def. Mot. at 2; *see also* AR § 1 at 374–78.  And so, PLM has made the Air Force's weapon system programs more effective and adaptive to real world demands.  AR § 1 at 328–29, 331–32.

The Air Force's commitment to PLM began nearly 20 years ago with the agency's acquisition of what was known then as Product Data Management ("PDM") software.  *Id.* at 294. Tinker Air Force Base acquired Siemens' PDM software products in 2000, in connection with its Integrated Data Information Manager ("IDIM") program.  *Id.*; *see also* AR § 6 at 6573–87, 6593–96, 6607–10 (discussing Air Force's PLM acquisition history).  In 2003, Wright-Patterson Air Force Base expanded the Air Force's acquisition of PDM software through a competitive contract issued to Intergraph Corporation for the Enhanced Technical Information Management System ("ETIMS").  *See* AR § 1 at 294–95, 453–66, 785–801, 804–28.  The ETIMS contract included contract line item numbers ("CLINs") for Siemens' Teamcenter perpetual licenses.  AR § 2 at 1041.  Siemens' predecessor, UGS Corporation, was a subcontractor on the IDIM contract. AR § 6 at 6572.

---

[1] The facts recited in this Memorandum Opinion and Order are taken from PTC's complaint ("Compl."); the administrative record ("AR"); PTC's motion for judgment upon the administrative record ("Pl. Mot."); and the government's motion to dismiss and cross-motion for judgment upon the administrative record ("Def. Mot.").  Except where otherwise noted, the facts recited here are undisputed.

In November 2004, the Air Force adopted an initiative to standardize its PDM solution across the agency. AR § 2 at 1060–62. Notably, the Air Force determined that the most effective way to accomplish this initiative was to leverage the agency's existing investment in Teamcenter software within the ETIMS contract. *Id.* at 1060. And so, in 2006, the Air Force awarded a competitive contract to Lockheed Martin Corporation, in which Teamcenter licenses were designated the PDM solution for the agency's Expeditionary Combat Support System ("ECSS") footprint. *See* AR § 1 at 501–08.

Through CLINs for Teamcenter software, the Air Force acquired thousands of Teamcenter perpetual software licenses. *Id.* at 494–97; *see also, e.g.*, AR § 2 at 1085, 1098–1100. The Air Force presently owns more than 59,375 Teamcenter perpetual software licenses, purchased primarily through the ETIMS and ECSS contracts. AR § 1 at 579, 594. Thousands of these licenses are active and in use today, while others are inactive. *Id.* at 295.

## 2. The Air Force's Market Research

In 2014, the Air Force explored the then-current state of commercially available PLM capabilities. *See id.* at 391–417. A July 2014 Air Force market research report compiled and analyzed market research from diverse sources and included responses to a public request for information and targeted market surveys from PTC and Siemens. *Id.* at 408–12; *see also* AR § 2 at 1437–46, 1457–66. As a result of the market research, the Air Force determined that both PTC and Siemens appeared to be technically qualified providers of commercial-off-the-shelf PLM solutions. AR § 1 at 412–13. And so, in 2015, the Air Force used this market research to develop a rough order of magnitude, estimating that it would cost more than $324 million to implement a standardized PLM solution through the purchase of an all new suite of perpetual software licenses. *Id.* at 337.

In October 2015, the Air Force's PLM Capability Initiative team ("PLM Team") summarized its research and recommendations, which focused on reusing software licenses already owned by the Department of Defense at a lower projected cost than purchasing a new suite of perpetual licenses. *See id.* at 517–54, *updating*, *inter alia*, *id.* at 829–58. The PLM Team concluded that there were two potential courses of action: (1) the Air Force could attempt to reuse its Air Force Materiel Command ("AFMC") PLM System, consisting of Siemens' Teamcenter licenses owned by the Air Force, or (2) the Air Force could attempt to reuse PTC

Windchill licenses, which the Department of the Army ("Army") owned. *Id.* at 529. The Air Force ultimately recommended reusing the existing Siemens' Teamcenter licenses, based upon consideration of cost, schedule, and a risk assessment. *Id.* at 537.

To support this recommendation, the Air Force's contracting officer explained in a statement that the Air Force was aware of owning at least 21,000 Teamcenter perpetual software licenses from competitive procurements, of which more than 6,000 were still in use. AR § 1 at 296–97; *accord* AR § 3 at 3524–28. The Air Force determined that there was not enough funding to purchase new licenses to implement standardization utilizing the software agency-wide. AR § 1 at 296–97. The agency also determined that using its own inventory would require minimal data migration and training and there would be no anticipated additional hardware or infrastructure costs. *Id.* And so, the PLM Team recommended that the Air Force test the technical capability of reuse of its existing Teamcenter software before committing to engage this software enterprise-wide. *Id.* at 297, 537.

### 3. The Build Zero Initiative

In November 2015, the Air Force approved testing of its existing AFMC PLM System which contained Siemens' Teamcenter perpetual software licenses for possible reuse as a "Build Zero" prototype. *Id.* at 515–16.

In December 2017 and January 2018, Siemens informed the Air Force that, in addition to the 21,000 perpetual licenses of which the agency was then aware, the Air Force also owned more than 30,000 inactive licenses. *Id.* at 469, 488. Siemens valued this inventory at more than $90 million and provided a rough estimate of $22 million to reactivate, upgrade, and standardize all existing licenses and provide continuing maintenance. *Id.* at 488. Based upon this information, the Air Force determined that the agency might have a viable option for meeting its PLM needs through a reuse strategy.[2] *Id.* at 299–300. And so, the PLM Team determined a

---

[2] The PLM Team's research also uncovered more than 50 Air Force program offices that had expressed interest in, or a need for, PLM software over the next decade. AR § 1 at 575–78. The Air Force also confirmed that its existing inventory of Siemens' Teamcenter software was acquired competitively. *Id.* at 781–84; *see also, e.g.*, AR § 6 at 6573–87, 6593–96, 6607–10 (discussing Air Force's PLM acquisition history).

"reuse strategy would be ideal," because the agency "had a number of excess, or unused, licenses from various Air Force programs."  *Id.* at 300.

Thereafter, the Air Force engaged in additional market research and estimated the cost of reactivation and upgrade of its existing inventory of Siemens' Teamcenter perpetual software licenses, plus continuing maintenance and related support, to be $24.587 million.  *See id.* at 300–03, 595, 599–611.  The Air Force relied upon General Services Administration ("GSA") prices to estimate:  (1) the cost of purchasing a new suite of Siemens' Teamcenter software to be $144.119 million; (2) the cost of purchasing PTC Windchill software to be $104.712 million; and (3) the cost of purchasing software from another vendor to be $188.001 million.  *Id.* at 300–02, 587–588, 595.[3]  Based upon this analysis, the Air Force concluded that the cost of purchasing a new license suite, maintenance, and original equipment manufacturer support would exceed $100 million.  *Id.* at 302, 595.  While the Air Force acknowledged that a competitive acquisition would likely draw discounts, the agency reasoned that competition was "unlikely" to overcome the estimated cost gap of more than $80 million between the estimate to reactivate ($24.587 million) and the lowest-priced competitor ($104.712 million).  *Id.* at 595; *see also id.* at 302.  And so, the Air Force decided to pursue a sole-source award to Siemens to purchase Teamcenter software. *Id.* at 591-98.

### 4.  The Air Force's Sole-Source Justification And Approval

In April 2018, the Air Force issued a "class" Justification and Approval ("J&A") for a sole-source award to Siemens to activate and maintain the agency's inventory of Teamcenter perpetual software licenses (the "PLM Contract").  *See id.* at 591–98.  The J&A provides that the contract will have a five-year base ordering period; six-year period of performance; and options to extend both periods for another five years.  *Id.* at 593.  The estimated contract ceiling for the contract is $24.587 million.  *Id.* at 597.

---

[3] The PLM Team subsequently determined that the GSA schedules reflected that Siemens did not offer subscription-based pricing, while PTC did offer this service.  *See* AR § 14 at 11,234–35.  And so, the Air Force estimated that it would cost $72.471 million for a PTC Windchill suite comprised of mixed perpetual and subscription-based licensing.  AR § 1 at 589.  The Air Force also determined that this amount was less than the $104.712 million estimated for a new suite of perpetual Windchill licenses, but still significantly more than $24.586 million ceiling on the Siemens award.  *Id.* at 587, 589, 593.

The J&A provides that "[t]he ID/IQ is predominately a contract for highly-specialized services." *Id.* at 593. The J&A also makes clear that the Air Force will "utilize" its existing inventory of "Air Force owned Teamcenter licenses," which were defined as 59,375 licenses of various earlier versions of Siemens' Teamcenter software. *Id.* In this regard, the J&A further provides that "on an as-needed basis," Siemens will reactivate licenses, upgrade the inactive software licenses, and standardize them and Siemens will provide "ongoing," "annual license maintenance." *Id.* In addition, the J&A provides that the Air Force "anticipates trading some of the existing licenses for specific Teamcenter modules to better meet the needs of Air Force users." *Id.* And so, the J&A concludes that the cost associated with this contract would be $24.587 million. *Id.*

As justification for the sole-source award, the J&A invokes 10 U.S.C. § 2304(c)(1), as implemented by FAR 6.302-1(a)(2)(iii)(A) and required by FAR 6.303-2(b)(4). *Id.* at 594. In this regard, the J&A explains that Siemens, as the original equipment manufacturer, is the only source that can reactivate, upgrade and trade the agency's existing inventory of Teamcenter perpetual software licenses, and by their nature such actions are "highly specialized services." *Id.* In addition, the J&A explains that the sole-source award meets "follow-on procurement" criteria, because the Air Force initially acquired the Siemens' Teamcenter perpetual software licenses via a full and open competition for the ETIMS contract. *Id.*

With regards to cost, the J&A states that reactivation of the existing inventory, valued at roughly $90 million, will be at a "lower cost" than purchasing a new suite of "another product." *Id.* Notably, the Air Force estimated the cost of a new suite of PTC Windchill—the lowest-priced provider of an alternative PLM product—to be $104.712 million. *Id.* at 594-95. And so, the J&A concludes that the resulting cost of new software licenses acquired through competition will be substantially higher than the estimated cost of reactivating existing licenses. *Id.* at 595. Given this, the Air Force concluded that "Siemens is the only firm capable of providing the supplies and services described . . . without the U.S. Air Force experiencing substantial duplication of cost that could not be expected to be recovered through competition." *Id.* at 596.

Following acquisition plan approval, the Air Force sent a Request for Proposal ("RFP") for the PLM Contract to Siemens. *See id.* at 612-64; *see also* AR § 8 at 10658–10726. The RFP provides that the goal of this contract is standardization through reactivation, renewal, trading,

and upgrade of the existing inventory of perpetual licenses, as needed, as well as continuing maintenance, OEM technical services support and training, and related travel.  *See* AR § 1 at 617–625.

In August 2018, Siemens submitted a proposal.  *Id.* at 305; *see also* AR § 9 at 10843–99. During the course of the negotiations with Siemens, the Air Force and Siemens reached an agreement in which the percentage discount for reactivation would be between [***] and [***] percent off the catalog price, and the Air Force would also receive a [***] percent discount off of maintenance costs for the currently active licenses.  AR § 12 at 11,151-52.  And so, in-person negotiations with Siemens ended with a handshake agreement on September 12, 2018.  *Id.*

### 5.   The Notice Of Intent To Award And PTC's Protest

On September 13, 2018, the Air Force published a Notice of Intent ("NOI") to award a sole-source contract to Siemens.  *See* AR § 1 at 665-74.  The NOI identified Siemens as the only responsible source "due to the information being proprietary."  *Id.* at 665.  The NOI also states that the anticipated contract will be a follow-on contract involving highly specialized services and a reasonable price.  *See id.* at 669-74.  In addition, the NOI invites all interested sources to respond in writing within seven days "with clear and convincing evidence to support their ability to provide timely and effective services."  *Id.* at 665.

On September 20, 2018, PTC submitted a response to the NOI.  *See id.* at 929-67.  In its response, PTC identifies its PTC Windchill software "under a subscription-based license model" and states that this software would "allow the [Air Force] to capture the highest degree of competitive advantage while achieving the lowest total cost."  *Id.* at 933.  PTC's response to the NOI does not address price or discounts.  *See id.* at 929-67.

On September 24, 2018, PTC filed a pre-award protest of the sole-source award to Siemens with the Government Accountability Office ("GAO").  *See id.* at 4-255.  The GAO denied this protest on December 20, 2018.  *Id.* at 982-95.  PTC commenced this action on January 30, 2019.  *See generally* Compl.

### B.     Procedural Background

PTC commenced this post-award bid protest action on January 30, 2019.  *See generally* Compl.  On January 30, 2019, PTC filed motions for a temporary restraining order and for a preliminary injunction.  *See generally* Pl. Mot. for TRO/Prelim. Inj.; Pl. Mem.

On February 25, 2019, the government filed the administrative record.  *See generally* AR. On March 19, 2019, PTC filed a motion for judgment upon the administrative record.  *See generally* Initial Pl. Mot.  On April 9, 2019, the government filed a motion to dismiss and cross-motion for judgment upon the administrative record and opposition to PTC's motion for judgment upon the administrative record.  *See generally* Def. Mot.

On April 9, 2019, the government filed a motion to strike the Declaration of [***] and a CIMdata report, which PTC filed in support of its motion for judgment upon the administrative record.  *See* Def. Mot. to Strike.  On April 9, 2019, Siemens filed a cross-motion for judgment upon the administrative record, response to PTC's motion for judgment upon the administrative record, and motion to dismiss.  *See generally* Def.-Int. Mot.

On April 23, 2019, PTC filed a response and opposition to the government's and Siemens' respective cross-motions for judgment upon the administrative record and motions to dismiss, and a reply in support of its motion for judgment upon the administrative record.  *See generally* Initial Pl. Resp.  On April 23, 2019, PTC also filed a response and opposition to the government's motion to strike and a motion to strike the Declaration of Andrew P. McMullen. *See generally* Pl. Mot. to Strike.

On April 26, 2019, the government filed a reply in support of its motion to strike and opposition to PTC's motion to strike.  *See* Def. Reply.  On May 3, 2019, PTC filed a reply in support of its motion to strike.  *See generally* Pl. Reply.

On May 7, 2019, the government filed a reply to PTC's response to its motion to dismiss and cross-motion for judgment upon the administrative record.  *See generally* Def. Reply.  On May 7, 2019, Siemens filed a reply in support of its cross-motion for judgment upon the administrative record and motion to dismiss.  *See generally* Def.-Int. Reply.

On June 17, 2019, PTC filed an unopposed motion to amend its motion for judgment upon the administrative record and reply brief.  *See generally* Pl. Mot. to Am. Br.  On June 20,

2019, PTC filed a corrected motion for judgment upon the administrative record and a corrected reply brief. *See generally* Pl. Mot.; Pl. Resp.

On June 19, 2019, the Court held oral argument on the parties' motions. *See generally* Oral Arg. Tr.

These matters having been fully briefed, the Court resolves the pending motions.

## III.    LEGAL STANDARDS

### A.    Bid Protest Jurisdiction And Standing

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  This Court reviews agency actions in bid protest cases under the Administrative Procedure Act's ("APA") "arbitrary and capricious" standard.  *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the APA).  Under this standard, an "'award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1331–32 (Fed. Cir. 2001)).

In this regard, the United States Court of Appeals for the Federal Circuit has explained that, "[w]hen a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis.'" *Id*. (quoting *Impresa,* 238 F.3d at 1332–33).  "'When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'"  *Id.* (quoting *Impresa,* 238 F.3d at 1333).  In addition, when reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977).  "The [C]ourt

should not substitute its judgment for that of a procuring agency . . . ." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997) (citation omitted).  And so, "[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (citation omitted).

The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  As long as there is "'a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  But, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

Standing is a threshold issue which implicates the Court's subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  And so, if a plaintiff cannot establish standing, the Court is without jurisdiction to render a decision on the merits of a claim. *See Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002).

When evaluating who qualifies as an interested party with standing to bring a bid protest claim, the Court looks to the definition of "interested party" provided in the Competition in Contracting Act ("CICA").  *Myers*, 275 F.3d at 1370 (quoting *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *see* 31 U.S.C. § 3551(2).  To have standing a plaintiff must show that: "'it [(1)] is . . . an actual or prospective bidder and [(2)] . . . has a direct economic interest' in the procurement or proposed procurement." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (alterations in original) (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); *see also* 31 U.S.C. § 3551(2).

In determining the second prong of standing—whether a plaintiff has a "direct economic interest" in the procurement—the Court generally applies the "substantial chance test" and inquires as to whether the plaintiff would have had a substantial chance of being awarded the contract, but for the alleged error in the procurement.[4]  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  The Federal Circuit has made clear that the "substantial chance" test applies in bid protests involving challenges to sole-source awards.  *Myers*, 275 F.3d at 1370; *see also Digitalis*, 664 F.3d at 1385 ("We see no reason to limit [the substantial chance test] to competitive procurements."); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) ("When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award.").  In such cases, the Court inquires as to whether the plaintiff could have competed for the contract at issue if the procurement process was competitive.  *See Myers*, 275 F.3d at 1370.  And so, while a plaintiff need not show that it would have received the award in a competition, a plaintiff must show that it would have been a qualified bidder to establish standing.  *Id.* at 1370–71.

### B.   RCFC 12(b)(1)

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all factual allegations in the complaint are true and must draw all reasonable inferences in the non-movant's favor.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); RCFC 12(b)(1).  But, a plaintiff bears the burden of establishing subject-matter jurisdiction, and it must do so by a preponderance of the evidence.  *See Reynolds v. Army & Air Force Exch. Servs.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  Should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); *see* RCFC 12(h)(3).

---

[4] The Federal Circuit has held that in certain pre-award bid protest matters involving a challenge to the terms of a solicitation, the Court may apply a different test to determine direct economic interest, namely, whether a plaintiff has a "non-trivial competitive injury which can be addressed by judicial relief."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009).

### C.     RCFC 52.1 And Supplementing The Administrative Record

Lastly, RCFC 52.1 generally limits the Court's review of an agency's procurement decision to the administrative record.  *Cf. Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("'[T]he focal point for judicial review should be the administrative record already in existence . . . .'" (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))).  Unlike a summary judgment motion brought under RCFC 56, the existence of genuine issues of material fact does not preclude judgment upon the administrative record under RCFC 52.1.  *See* RCFC 52.1; *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242–43 (2011).  Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

The Federal Circuit has also held in *Axiom*, that the "parties' ability to supplement the administrative record is limited" and that the administrative record should only be supplemented "if the existing record is insufficient to permit meaningful review consistent with the APA."  564 F.3d at 1379-81; *see also Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 93 (2013).  This Court has interpreted the Federal Circuit's directive in *Axiom* to mean that supplementation of the administrative record is permitted to correct mistakes and fill gaps, but is not permitted when the documents proffered are unnecessary for an effective review of the government's procurement decision.  *L-3 Commc'ns EOTech, Inc v. United States*, 87 Fed. Cl. 656, 672 (2009).  And so, this Court has precluded supplementation of the administrative record with declarations that contain "post-hoc contentions of fact and argument."  *Id.*

This Court has also held that the proper standard of review for a motion to strike a document from the administrative record is the mirror image of the one that applies to motions to supplement the administrative record.  *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 156 (2015); *see also Axiom Res. Mgmt*, 564 F.3d at 1380–81.  Given this, the Court will strike a document from an administrative record if its inclusion would preclude effective, meaningful judicial review.  *Raytheon Co.*, 121 Fed. Cl. at 156.  ("Given the importance of having a properly constituted administrative record to permit meaningful judicial review, common sense demands that the court use the same standard for motions to supplement the administrative record and motions to remove documents from the administrative record.").

**D.      Injunctive Relief**

Under its bid protest jurisdiction, the Court "may award any relief that [it] considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  In deciding whether to issue a permanent injunction, the Court "considers: (1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *see also Centech Grp., Inc.*, 554 F.3d at 1037.  In this regard the Federal Circuit has held that:

> No one factor, taken individually, is necessarily dispositive.  If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others.  If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (citations omitted).

A plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon a motion for injunctive relief.  *Cf. Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004) (finding that a plaintiff who cannot demonstrate likely success upon the merits cannot prevail upon its motion for preliminary injunctive relief).  This Court has also found success upon the merits to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." *Dellew Corp. v. United States*, 108 Fed. Cl. 357, 369 (2012) (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007)).  But, while success upon the merits is necessary, it is not sufficient alone for a plaintiff to establish that it is entitled to injunctive relief.  *See Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 353 (2012) (("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citations omitted)).

IV.     **LEGAL ANALYSIS**

The government has moved to dismiss this matter for lack of subject-matter jurisdiction, pursuant to RCFC 12(b)(1), upon the ground that PTC lacks standing to bring this case.  *See generally* Def. Mot. at 19-24.  Siemens has also moved to dismiss this matter for lack of subject-matter jurisdiction upon the ground that PTC lacks standing.  *See generally* Def.-Int. Mot. at 20-23.

In its response and opposition to these motions, PTC counters that it has standing to pursue this bid protest dispute because it would be a qualified bidder if the PLM Contract were subject to an open competition.  Pl. Resp. at 5-11.  And so, PTC requests that the Court deny the motions to dismiss filed by the government and Siemens.  *Id.* at 30.

The parties have also filed cross-motions for judgment upon the administrative record on the issue of whether the Air Force's sole-source award of the PLM Contract is arbitrary, capricious, or contrary to law.  *See generally* Pl. Mot.; Def. Mot. at 25-42; Def.-Int. Mot. at 24-46; RCFC 52.1.  In its motion for judgment upon the administrative record, PTC argues that the Air Force's sole-source award decision is unreasonable and contrary to law because:  (1) the award to Siemens is not a follow-on contract for the continued provision of highly specialized services from the original source of those services; (2) the Air Force arbitrarily and capriciously assumed that competition would not lead to meaningful cost savings; (3) the Air Force failed to conduct meaningful market research; (4) the Air Force failed to engage in reasonable advanced planning and abandoned competition for the sake of administrative convenience; and (5) the Air Force breached its duty to promote full and open competition, conduct business with integrity, fairness and openness, and treat all contractors and prospective contractors fairly and impartially.  Pl. Mot. at 20-40.  And so, PTC requests that the Court set aside the Air Force's sole-source award decision and direct the Air Force to open the PLM Contract to full and open competition.  *See id.* at 40; Compl. at Prayer for Relief.

The government and Siemens counter in their respective cross-motions for judgment upon the administrative record that the Air Force's decision to award the PLM Contract to Siemens was reasonable and in accordance with law because:  (1) the Air Force properly justified its sole-source award as a follow-on contract for the continued provision of highly specialized services from the original source of those services; (2) alternate grounds exist for

invoking the "one responsible source" exception to CICA; (3) the Air Force's cost analysis of alternate PLM solutions was rational; (4) the Air Force engaged in adequate and fair market research; (5) the Air Force did not abandon competition for convenience; and (6) the Air Force did not breach its duties to promote full and open competition, conduct business with integrity, fairness, and openness, and treat all contractors fairly and impartially. *See* Def. Mot. at 25-42; Def.-Int. Mot. at 24-46. And so, the government and Siemens request that the Court sustain the Air Force's sole-source award decision. *See* Def. Mot. at 47; Def.-Int. Mot. at 48.

PTC has also filed motions for a temporary restraining order and for a preliminary injunction seeking to enjoin the Air Force from proceeding with the performance of the PLM Contract. *See generally* Pl . Mot. for TRO/Prelim. Inj. In addition, PTC and the government have filed motions to strike certain documents from the administrative record. *See generally* Def. Mot. to Strike; Pl. Mot. to Strike. Lastly, PTC has filed an unopposed motion to amend its motion for judgment upon the administrative record and reply brief to correct certain citations. *See generally* Pl. Mot. to Am. Br.

For the reasons set forth below, the parties have appropriately submitted the [***] and McMullen Declarations as part of the Court record for this bid protest dispute. But, PTC improperly seeks to supplement the administrative record with the CIMdata report. PTC has also not shown that it has standing to pursue its protest of the Air Force's decision to award the PLM Contract to Siemens. And so, the Court: (1) **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to strike; (2) **DENIES** PTC's motion to strike; (3) **GRANTS** the government's motion to dismiss this matter for lack of subject-matter jurisdiction; (4) **DENIES** as moot Siemens' motion to dismiss this matter for lack of subject-matter jurisdiction and the parties' cross-motions for judgment upon the administrative record; (5) **DENIES** PTC's motions for a temporary restraining order and for a preliminary injunction; (6) **GRANTS** PTC's unopposed motion to amend its motion for judgment upon the administrative record and reply brief; and (7) **DISMISSES** the complaint.

A.      **The Motions To Strike**

As an initial matter, the Court grants-in-part and denies-in-part the government's motion to strike the CIMdata report and [***] Declaration filed in connection with PTC's motion for judgment upon the administrative record. In its motion to strike, the government requests that

the Court strike these documents, as well as all references to these documents in PTC's motion for judgment upon the administrative record, because the documents were not before the Air Force when the agency made the decision to award the PLM Contract to Siemens.  Def. Mot. to Strike at 1-2.

It is well-established that the focal point of the Court's review in this case is the administrative record already in existence, not some new record made initially in the reviewing court.  *Pitts*, 411 U.S. at 142.  Given this, the administrative record should only be supplemented in this case to correct mistakes and fill gaps "if the existing record is insufficient to permit meaningful review consistent with the APA."  *Axiom Res. Mgmt*, 564 F.3d at 1379-81.

This Court has also held that the proper standard of review for a motion to strike a document from the administrative record is the mirror image of the one that applies to motions to supplement the administrative record.  *Raytheon Co.*, 121 Fed. Cl. at 156 (2015); *see also Axiom Res. Mgmt.*, 564 F.3d at 1380-81.  And so, the Court will strike a document from the administrative record if its inclusion would preclude effective, meaningful judicial review. *Raytheon Co.*, 121 Fed. Cl. at 156 ("Given the importance of having a properly constituted administrative record to permit meaningful judicial review, common sense demands that the court use the same standard for motions to supplement the administrative record and motions to remove documents from the administrative record.").

In this case, a review of the CIMdata report and PTC's motion for judgment upon the administrative record shows that PTC relies upon the CIMdata report to attack the merits of the Air Force's sole-source award decision.  Pl. Mot. at 13 n.5, 19, Ex. 2; *see* Def. Mot. to Strike at 1-2.  For example, PTC relies upon the CIMdata report to show that "[m]any [PLM] solution providers are trying to move to subscription pricing and licensing" and to show that the PLM market "has changed dramatically" since 2014 and 2015.  Pl. Mot. at 13 n.5, 19; Oral Arg. Tr. at 33:25-34:7.  Given this, the CIMdata report does not fill any gaps in the existing administrative record, but, rather, is used by PTC to attack the merits of the Air Force's decision to award the PLM Contract to Siemens.  *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1379-81.  And so, the Court **GRANTS** the government's motion to strike this report from the administrative record.

A careful review of the [***] Declaration shows, however, that PTC has appropriately submitted this declaration to establish that it is a qualified bidder with standing to bring this bid

protest.  Pl. Mot. to Strike at 2.  This Court has held that a plaintiff may show that it is a qualified bidder based upon "material before the agency at the time of the sole-source award *and* materials provided by [the protestor] during the course of [the] bid protest." *Innovation Dev. Enters. of Am., Inc. v. United States*, 108 Fed. Cl. 711, 724 (2013) (emphasis original).  The [***] Declaration, and the portions of PTC's motion for judgment upon the administrative record which rely upon it, address whether PTC is a qualified bidder and, specifically, PTC's ability to offer subscription PLM software licenses and provide a price discount.  [***] Decl. at ¶¶ 6, 8, 12; *see* Pl. Mot. at 5, 13, 14 n.6, 16 n.8, 19 n.9, 30 (citing the [***] Declaration).  Given this, the [***] Declaration—and the related portions of PTC's motion for judgment upon the administrative record—appropriately address whether PTC has standing to pursue this bid protest matter.  *See* [***] Decl. at ¶¶ 6, 8, 12; Pl. Mot. at 5, 13, 14 n.6, 16 n.8, 19 n.9, 30.  And so, the Court **DENIES** the government's motion to strike this information.

The Court must also deny PTC's motion to strike the Declaration of Andrew P. McMullen filed in support of the government's cross-motion for judgment upon the administrative record.  Def. Mot. at 47.  This Court may consider information that is not contained in the administrative record as part of the Court record in a bid protest matter if the information pertains to the factors to be weighed by the Court in deciding whether to grant injunctive relief.  *See AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366-67 (2009).  In this case, a careful review of the McMullen Declaration shows that the government has offered this declaration to show that the injunctive factors relating to the balance of harms and the public interest weigh in favor of the government.  McMullen Decl. at ¶¶ 3, 8-9; *see also* Def. Mot. at 47 (referencing the McMullen Declaration).  Because the government has appropriately submitted the McMullen Declaration in response to PTC's request for injunctive relief, the Court **DENIES** PTC's motion to strike this declaration.  *AshBritt, Inc.*, 87 Fed. Cl. at 366-67.

## B.     PTC Fails To Establish Standing

Turning to the merits of the government's motion to dismiss, the government persuasively argues that PTC has not shown that it has standing to pursue this post-award bid protest dispute.  And so, the Court must **GRANT** the government's motion to dismiss and **DISMISS** this matter for lack of subject-matter jurisdiction.  RCFC 12(b)(1).

It is well-established that standing is a threshold matter which implicates the jurisdiction of this Court. *Lujan*, 504 U.S. at 561. And so, to have standing in this case, PTC must show that it: (1) is an actual or prospective offeror and (2) has a direct economic interest in the procurement or proposed procurement. *Diaz*, 853 F.3d at 1358; *Reynolds*, 846 F.2d at 748. To determine whether PTC has a "direct economic interest" in the Air Force's sole source award to Siemens, the Court inquires as to whether PTC could compete for the PLM Contract if the procurement process for this contract had been competitive. *Myers* at 275 F.3d at 1370. And so, PTC must show that it would have been able to compete for the PLM Contract to establish standing. *Id.* at 1370-71. PTC makes no such showing in this case for several reasons.

### 1.    PTC Is Not Responsible

First, PTC has not shown that it would be a responsible contractor for the PLM Contract if permitted to compete for the award of this contract.[5] In this regard, the Federal Circuit has held that "[a]wards may not be made to contractors that are not responsible." *Myers*, 275 F.3d at 1371. And so, to be a responsible contractor with standing to pursue this bid protest, PTC must show that it is able to perform the contract at issue. *Id.* (citing 48 C.F.R. § 9.103(a)); *see also* 48 C.F.R. § 9.104-1 (defining responsibility).

The Court agrees with the government that PTC has not shown that it is a responsible contractor with respect to the PLM Contract, because it is undisputed that PTC cannot reactivate and upgrade the Air Force's existing inventory of Teamcenter perpetual software licenses, as required by the PLM Contract. Def. Mot. at 20-21; Oral Arg. Tr. at 20:15-20:21. The administrative record makes clear that the goods and services to be provided under the PLM Contract involve providing a PLM solution that leverages the Air Force's existing inventory of Teamcenter perpetual software licenses. AR § 1 at 593. Notably, the J&A for this contract provides that the PLM Contract is "to activate and maintain licenses for Siemens Teamcenter commercial software." *Id.* And so, the J&A makes clear that the PLM Contract "is predominantly for . . . reactivation of Teamcenter licenses on an as-needed basis, in order to

---

[5] During oral argument, the government argued that PTC does not meet the actual or prospective bidder prong of standing because PTC's response to the Notice of Intent was not "substantively responsive." Oral Arg. Tr. at 44:18-44:22.

upgrade the inactive software licenses to current software version, as well as for ongoing maintenance of the reactivated licenses." *Id.*

The requirement that the contractor be capable of reactivating and maintaining the Air Force's existing Teamcenter perpetual software licenses is reaffirmed in the RFP for the PLM Contract. AR § 1 at 617. Specifically, the RFP provides that the goal of this contract "is to reactivate and maintain licenses for Siemens Teamcenter commercial software." *Id.* And so, again, the administrative record makes clear that the PLM Contract requires that the awardee be able to reactive the Air Force's existing inventory of Teamcenter perpetual software licenses and to maintain these licenses. *Id.* at 593, 617.[6]

The administrative record also makes clear that PTC cannot provide this service. In its response to the Air Force's Notice of Intent to award a sole-source contract to Siemens, PTC identifies its PTC Windchill software "under a subscription-based license model" and states that this software would "allow the [Air Force] to capture the highest degree of competitive advantage while achieving the lowest total cost." *Id.* at 933. But, PTC's response to the NOI does not state that it could reactivate the Air Force's existing inventory of Teamcenter perpetual software licenses or maintain these licenses. *See generally id.* at 929-67.

The Federal Circuit has recognized that "the notice of intent issued by the government is analogous to a request for a proposal" and so, the Court may look to PTC's response to the NOI to assess whether it is responsible. *Digitalis*, 664 F.3d at 1385. Because PTC failed to provide any information regarding how it could reactivate and maintain the Air Force's existing Teamcenter perpetual software licenses in its response to the NOI—and PTC has not otherwise shown that it could provide this service—the Court agrees with the government that PTC is not a responsible contractor with standing to bring this case. *See id.*

The government also persuasively argues that PTC is not a responsible contractor, because PTC does not offer the perpetual licenses that the government seeks in connection with

---

[6] The government also persuasively argues that the Air Force's decision to pursue an enterprise-wide standardization that leverages its existing inventory of perpetual software licenses is a policy decision which PTC cannot challenge in this bid protest. *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330-31 (Fed. Cir. 2018); Def. Mot. at 22; Oral Arg. Tr. at 55:7-55:13. In this regard, the record shows that the Air Force decided to pursue a reuse strategy in October 2015, almost three years before the Air Force issued the J&A in April 2018. AR Tab § 1 at 523, 529, 591; *see* Oral Arg. Tr. at 43:16-43:22.

the PLM Contract.  Def. Mot. at 21-22; [***] Decl. at ¶ 8; AR § 1 at 677.  PTC acknowledges that it no longer sells perpetual software licenses.  *See* [***] Decl. at ¶ 8; AR § 1 at 677.  And so, there is no genuine dispute in this case that PTC also cannot provide the perpetual licenses that the Air Force requires under the PLM Contract.  AR § 1 at 579-80, 295-98; AR § 4 at 4044-45; *see generally* AR §§ 1-6 (providing the Air Force's market research on acquiring perpetual licenses).

The Court is also not persuaded by PTC's argument that it has standing to bring this action because its PLM software "is one of the top three PLM solutions approved for [g]overnment use."  Pl. Resp. at 8.  While PTC's Windchill software may be a top PLM solution, PTC acknowledges that this solution cannot reactivate or maintain the Air Force's existing inventory of software licenses, as required by the PLM Contract.  Oral Arg. Tr. at 20:15-20:21; *see* Pl. Resp. at 8.  PTC's argument that it has standing because the Air Force determined that its Windchill software could meet the agency's needs in 2014 is equally unavailing.  *Id.*; *see* Pl. Mot. at 17; Def. Mot. at 21-22.  As the government explains, the Air Force's determination at the time was based upon PTC's status as a vendor of PTC Windchill perpetual software licenses.  Def. Mot. at 21-22.  But, as discussed above, PTC acknowledges that it no longer offers perpetual software licenses.  [***] Decl. at ¶ 8; AR § 1 at 677.  And so, the status of PTC's Windchill software in the marketplace and the Air Force's 2014 determination are not sufficient to establish that PTC has standing to pursue this case.

Because it is undisputed that PTC cannot reactivate and maintain the Air Force's Teamcenter perpetual software licenses as required by the PLM Contract, PTC has not shown that it would be able to perform the PLM Contract.  *Myers*, 275 F.3d at 1371 (citing 48 C.F.R. § 9.103(a)); *see also* 48 C.F.R. § 9.104-1 (defining responsibility).  And so, the Court concludes that PTC is not a responsible contractor with standing to bring this matter.  *Myers*, 275 F.3d at 1371; RCFC 12(b)(1).

## 2.   PTC Has Not Shown That It Can Compete With Siemens' Price

PTC also fails to establish standing because the record evidence shows that PTC could not compete with the price agreed to by Siemens to perform the PLM Contract.  In this regard, the administrative record shows that Siemens has agreed to perform the PLM Contract for $24.587 million.  AR § 1 at 595; *see also* AR § 14 at 11,336.

A review of PTC's response to the NOI reveals, however, that PTC did not provide a proposed price to perform the PLM Contract, or address price discounts, in this response.  *See generally* AR § 1 at 929-67.  PTC's reliance upon the [***] Declaration to show that it could provide a competitive price for the PLM Contract is also misplaced.  *See* Oral Arg. Tr. at 28:19-29:23.  This declaration neither commits to a particular price, nor provides a range of prices for which PTC would be willing to perform the PLM Contract.  *See generally* [***] Decl.  Given this, PTC has not provided sufficient information to show that it could compete for the PLM Contract if the procurement at issue was competitive.

Because PTC has not shown that it could provide the goods and services required under the PLM Contract, or that it could compete with the price that Siemens agreed to to perform the contract, PTC has not met its burden to show that it has standing to pursue this bid protest dispute.  And so, the Court **GRANTS** the government's motion to dismiss and **DISMISSES** this matter for lack of subject-matter jurisdiction.[7]  RCFC 12(b)(1).

### C.      PTC Is Not Entitled To Injunctive Relief

As a final matter, PTC has not shown that it is entitled to the injunctive relief that it seeks in this matter, because PTC has not prevailed upon the merits of any of its claims.  A plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon a motion for injunctive relief.  *Cf. Nat'l Steel Car, Ltd.*, 357 F.3d at 1325 (finding that a plaintiff who cannot demonstrate likely success upon the merits cannot prevail upon its motion for preliminary injunctive relief).  Because PTC has not prevailed upon any of its claims challenging the Air Force's sole source award decision, the Court must **DENY** PTC's request for injunctive relief.

### V.      CONCLUSION

In sum, the parties have demonstrated that the Court may consider the [***] Declaration and McMullen Declaration as part of the Court record for this bid protest dispute.  But, PTC has not shown that it is appropriate to include the CIMdata report in the administrative record.  In

---

[7] Because the Court concludes that PTC lack standing to pursue this bid protest dispute for the reasons set forth in the government's motion to dismiss, the Court does not reach the merits of Siemens' motion to dismiss, or the issues raised in the parties' cross-motion for judgment upon the administrative record.

addition, PTC has not shown that it has standing to pursue its protest of the Air Force's decision to award the PLM Contract to Siemens.

And so, the Court:

1. **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to strike;

2. **DENIES** PTC's motion to strike;

3. **GRANTS** the government's motion to dismiss this matter for lack of subject-matter jurisdiction;

4. **DENIES** as moot Siemens' motion to dismiss this matter for lack of subject-matter jurisdiction and the parties' respective cross-motions for judgment upon the administrative record;

5. **DENIES** PTC's motions for a temporary restraining order and for a preliminary injunction;

6. **GRANTS** PTC's unopposed motion to amend its motion for judgment upon the administrative record and reply brief; and

7. **DISMISSES** the complaint.

The Clerk shall enter judgment accordingly.

Each party to bear its own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on February 4, 2019. This Memorandum Opinion and Order shall therefore be filed **UNDER SEAL**. The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication. The parties shall **FILE** a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the

basis for each proposed redaction on or before **July 26, 2019**.

       **IT IS SO ORDERED.**


                         s/ Lydia Kay Griggsby_____

                         LYDIA KAY GRIGGSBY

                         Judge